

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00263-CV

———————————————————

IN THE ESTATE OF LONNIE K. LEDBETTER, JR., DECEASED

---

On Appeal from County Court at Law
Hood County, Texas
Trial Court No. P10686

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

At the age of eighty-one, the decedent Lonnie K. Ledbetter, Jr. (Lonnie)[1] married Appellant Tawni Ledbetter (Tawni). A little over a year later, Lonnie died. Prior to his death, Lonnie made certain changes to his will and to trust documents in favor of Tawni. The day that he died, Lonnie's adult children—Appellees Lonnie K. Ledbetter, III (Trace) and Kendall Ledbetter Hohmann (Kendall)—filed a lawsuit against Tawni, alleging that Lonnie had lacked the requisite mental and testamentary capacity to sign certain documents after his marriage to Tawni and that he had been unduly influenced by Tawni to sign the documents. Following a hearing, the trial court signed a temporary injunction order enjoining Tawni from taking certain actions regarding various assets and funds belonging to Lonnie's estate and trusts.

In two issues in this appeal,[2] Tawni argues that (1) the trial court lacks jurisdiction over the trust claims, and thus the temporary injunction order should be vacated because it is based on the trust claims; and (2) the trial court abused its discretion by issuing a temporary injunction order that does not comply with Texas Rule of Civil Procedure 683. *See* Tex. R. Civ. P. 683. We will first hold that the trial court had jurisdiction to enter the temporary injunction order. We will then hold that

---

[1]We will refer to the decedent and the parties by their first names—or in one of their cases, by a nickname—because they share the same surname.

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4).

the trial court abused its discretion by issuing the order because it is impermissibly vague as to the acts sought to be restrained and because it is overly broad—both of which are in violation of Rule 683. *See id.* Accordingly, we will reverse the temporary injunction order and remand the case to the trial court for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Lonnie's Successful Business, His Two Children with His First Wife, His Later Marriage to Saundra, and the Ledbetter Trusts

Lonnie was a successful businessman. He started an insurance business—State National Insurance Company—with two of his brothers and amassed significant wealth during his lifetime.

Lonnie had two children—Trace and Kendall—with his first wife, Sharon. He married his second wife—Saundra Ledbetter—in or around 1979. Lonnie and Saundra remained married for approximately forty-four years.

While they were married, Lonnie and Saundra created "The Lonnie and Saundra Ledbetter Family Foundation" (the Foundation). They also made various trusts including the "The Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust." That trust created several other trusts, including the Community Property Trust, the Exempt Family Trust, the Non-Exempt Family Trust, and the

3

Marital Trust (collectively, the Ledbetter Trusts). As best as we can glean,[3] the Ledbetter Trusts provided certain income and principal to Lonnie and Saundra during their lifetimes, gave Lonnie certain powers of appointment should he be the surviving grantor, and called for certain of the Ledbetter Trusts' assets to be distributed to the Foundation and to certain trusts for the benefit of Trace and Kendall upon the death of the surviving grantor.

## B. Saundra's Death in March 2023, Lonnie's Pursuit of the Fictional "Nicole" in October 2023, and His Marriage to Tawni in December 2023

In March 2023, Saundra died. According to Mike Sinks, a longtime employee of Lonnie's who saw him nearly every day during 2023,[4] Lonnie was "really depressed" after Saundra died. Sinks stated that around that time, Lonnie started "looking to date somebody."

In or around October 2023, Lonnie began communicating with a person on Match.com that he believed to be named "Nicole." After communicating with "Nicole" for "a month or two," Lonnie wanted to propose marriage to "Nicole" despite having never met her in person. Trace and Sinks were suspicious of "Nicole," and they discovered that she was a "scam artist." According to Sinks, it took "a while" to convince Lonnie that "Nicole" was a "fake person." Eventually, Trace and

---

[3]In their respective briefs, the parties say very little about the details of the Ledbetter Trusts and how they were to operate. Indeed, in her brief, Tawni states, "The precise details of the trusts are not particularly pertinent in this appeal."

[4]Sinks testified that he worked for Lonnie from 1990 until 2025.

4

Sinks convinced Lonnie that "Nicole" was a "scam artist" when she asked him for money to come and visit him.

During the same time that he was communicating with "Nicole," Lonnie also pursued a relationship with Tawni. At the temporary injunction hearing, Tawni claimed that she first had a conversation with Lonnie at a horse show "[t]wo or three years" before 2023. She said that the two of them had "[l]ots of other conversations" before November 2023 and that they began dating in August 2023. Others suggested that Lonnie's involvement with Tawni had started later. According to Sinks, Lonnie called him at the end of November 2023 to inquire about Tawni, asking him if he "knew who this effing lady was and what did she effing want." Sinks testified that Lonnie had asked him to contact another person that they knew to obtain information about Tawni, and after contacting that person, Sinks reported back to Lonnie that he should stay away from Tawni because she was "crazy." Sinks testified that he did not see anything to suggest that Lonnie and Tawni were dating prior to November 2023. Trace testified that he had never heard of Tawni until mid-December 2023.

Tawni testified that Lonnie had started asking her to marry him shortly after they first started dating. Tawni stated that on December 20, 2023, she agreed to marry Lonnie. According to Tawni, Lonnie told her that they would get married the next day, and he asked her to pick whether she wanted to get married in Oklahoma or Colorado.

The next day—December 21, 2023—Lonnie and Tawni were married in Oklahoma. Tawni's son officiated the wedding. Tawni admitted that one of the reasons that she and Lonnie married in Oklahoma was because there was no "waiting period" once they got their marriage license. Tawni stated that she did not have any communications with Trace or Kendall regarding the fact that she and Lonnie were to be married, nor was she aware of whether Lonnie had informed Trace or Kendall that they were to be married.

## C. Tawni's Checkered Past and Her Evasiveness Regarding Her Past

Lonnie's family had questions regarding Tawni's background, and several background checks were performed on her. Questions regarding Tawni's background were at the forefront of the temporary injunction hearing. Many of those questions remained unanswered because Tawni asserted her Fifth Amendment right against self-incrimination over twenty times at the hearing, including to questions regarding the following:

- the date of her birth;

- the date of her birth that is reflected on her driver's license;

- whether she possessed a certified copy of her birth certificate;

- the name given to her at birth;

- the names of her mother and father;

- whether she had previously sworn in depositions that her name was "Tawni Andrea Jean McKeller Wirshup";

6

- whether she was born in Sweden;

- whether she had told people that her parents were Swedish and that she had been born in the Oakland airport;

- whether she had told people that she had immigrated from Sweden;

- whether she had told people that she had served in the Swedish military;

- whether she was from Gothenburg, Sweden, as reported on her Facebook page;

- how she became a Swedish citizen;

- why her passport was seized;

- whether she had told Lonnie that she was born on December 27, 1956;

- whether she had told Lonnie and his family and friends that she was sixty-six years old when she married him; and

- whether she had lied to Lonnie and Trace about her age.

At the hearing, Tawni admitted to having lied in the past, particularly regarding her education. She stated that she had lied about attending the Massachusetts Institute of Technology (MIT). She also admitted that in a prior deposition she had stated that she had attended the University of Florida, but that was untrue. She further admitted that she had previously testified that she "went" to other universities but that rather than enrolling in those universities, she had simply taken "outside classes" that the universities had offered.

7

Exhibits depicting Tawni's LinkedIn profile were admitted into evidence. Tawni's profile reflected that she has a "Master of Science in Astronautics & Aeronautics" from MIT and a "Bachelor of Engineering" from Chalmers University of Technology. Tawni stated that the information in her profile was false, noting that she "ha[d] no college background."[5] Tawni stated that she had "made up fluff" about her education "to make [her]self look good in the industry that [she] was in."

At the hearing, Tawni testified that she had been married six times including her marriage to Lonnie. She later admitted that a seventh man had claimed that he had been married to her although Tawni maintained that she had never married that individual. In a Michigan case between Tawni and one of her ex-husbands involving a suit affecting the parent–child relationship, the Michigan trial court made findings regarding the "moral fitness of the parties" and the "mental health of the parties." *Jones v. Giannotti*, No. 266568, 2007 WL 2051545, at *7 (Mich. App. July 17, 2007) (per curiam). In those findings, the trial court stated that Tawni[6] "exaggerates on everything" and noted that she "prefabricates [and] manipulates." *Id.* The Michigan

---

[5]Tawni claimed that she "ha[s] nothing to do with [her] LinkedIn page" and that someone with her permission "handle[s]" the page.

[6]In the Michigan case, Tawni's name was listed in the case style as "Tohnni J. Jones, f/k/a Tohnni Reed-Giannotti." *Id.* at *1.

8

trial court described Tawni as "a con artist," a "scam artist," and a "psychopathic liar."[7] *Id.*

Tawni also admitted to having filed for bankruptcy in 2012.[8] She stated that she was "discharged in like a year" following that bankruptcy filing. At the temporary injunction hearing, Tawni could not recall whether her bankruptcy discharge was ever set aside, nor could she recall whether the bankruptcy trustee had alleged that she had concealed assets.[9] Tawni indicated that she had made a "mistake" when listing her assets and that she "didn't have anything to do" with the bankruptcy filing. She also testified that she had sold her aviation business and a building for over $4 million in 2012 although she maintained that the sale had occurred after she had filed her bankruptcy petition. When asked about some litigation that had come out of that bankruptcy case, Tawni admitted that she had stated in a prior deposition that she had taken $200,000 from someone else's account without his permission.

---

[7]A Michigan appellate court stated that the trial court's findings in this regard were not against the great weight of the evidence. *Jones*, 2007 WL 2051545, at *7.

[8]On the first page of her bankruptcy filing, Tawni estimated that her assets were between $0 and $50,000. On that same page, she estimated that her liabilities were between $0 and $50,000. In a summary of schedules attached to her petition, her assets were valued at $50,150, and her liabilities were valued at $315,726.

[9]She did recall that "[t]here was some question as to whether or not a note that was paid to an entity was supposed to have been disclosed in [her] schedules" but said that she did not remember because "it was a long time ago."

9

At the temporary injunction hearing, Tawni denied telling Lonnie that she had sold her aviation company for $90 million, and she also denied having told people that she had served in the Swedish military. But audio clips admitted at the temporary injunction hearing told a different story. Those audio clips featured a conversation that had taken place on January 8, 2024, between Tawni and Trace. Other people, including Lonnie, were present during the conversation. During that conversation, Tawni stated that she had served in the "Swedish military through the U.S. Marines." She also indicated during the conversation that she had sold her aviation business for $90 million.

## D. Tawni's Alleged Control of Lonnie After the Marriage

Sinks stated that his relationship with Lonnie changed after "Tawni came on the scene." Sinks testified that he had "started being separated away from" Lonnie and that he could not get Lonnie to speak with him. Sinks maintained that whenever he spoke to Lonnie on the phone, Tawni got on the phone with them. Sinks stated that if he showed up to speak with Lonnie in person, Tawni "would show up in person as soon as [he] got there." Sinks said that he thought that Tawni had blocked Lonnie's cell phone calls because whenever he unblocked Lonnie's phone, it would be blocked the next day. Sinks further testified that cameras had been installed in Lonnie's bedroom in 2023 or 2024.

Sinks stated that Lonnie's relationship with Trace and Kendall changed after he became involved with Tawni. Sinks described the relationship as "severed." Sinks

10

testified that Lonnie had handled his own finances before becoming involved with Tawni. Sinks stated that once Lonnie got involved with Tawni, Tawni handled Lonnie's finances. According to Sinks, that was inconsistent with Lonnie's character prior to his marriage to Tawni. After the marriage, Lonnie bought a jet and a yacht. Tawni also purchased property in Florida following the marriage. Sinks also testified that after Lonnie's marriage to Tawni, "basically all of [Lonnie's] employees were let go[,] and [Tawni's] people were brought in."

According to Trace, prior to Lonnie and Tawni's marriage, he had a "very good relationship" with his father. Trace stated that he had worked with his father at State National Insurance Company for around thirty years and that the two of them "spent a tremendous amount of time together." Trace estimated that prior to 2020, he had spent "at least an hour or two" with his father "[e]very day" that Lonnie had come into the office. Trace stated that prior to December 2023, he and his father had gotten together outside of work "[o]nce or twice every month" and that he had spoken to his father "[s]everal times a week." Trace testified that "[e]verything changed" after Lonnie married Tawni. Trace said that his ability to have access to Lonnie was greatly diminished after the marriage. Trace also indicated that it became difficult to communicate with Lonnie after the marriage because Trace "was blocked from [Lonnie's] cell phone."[10] Trace stated that when he was able to talk to Lonnie

---

[10]Trace maintained that Tawni was the one blocking the calls because Lonnie "did not have the technical know-how to do that."

11

on the phone, it was on speaker phone, and there were voices in the background. Trace's wife also indicated that her phone number was blocked from Lonnie's phone and that Tawni would not let her see Lonnie.

Adult Protective Services (APS) conducted "several" investigations pertaining to Lonnie's well-being following his marriage to Tawni.[11] Tawni testified that nothing had come out of those investigations and that the APS cases had been "dismissed."

In June 2024, Lonnie sued Trace in his capacity as trustee of certain trusts,[12] alleging that Trace had breached his fiduciary duty by failing to protect the assets of the trusts and seeking the removal of Trace as trustee of the trusts. In October 2024, Lonnie nonsuited that lawsuit against Trace.

**E. The Changes to Lonnie's Will and to the Ledbetter Trusts and Lonnie's Death in April 2025**

Following his marriage to Tawni, Lonnie made four new wills. Pursuant to the October 2, 2024 will, Lonnie exercised his power of appointment regarding the Ledbetter Community Property Trust, the Ledbetter Marital Non-Exempt Trust, the Ledbetter Family Exempt Trust, and the Ledbetter Family Non-Exempt Trust. Through that power of appointment, he devised eighty percent of those trusts to Tawni and twenty percent of those trusts to the Foundation. In the will, he further

[11]Trace stated that he was not aware of any findings by APS that Lonnie lacked capacity. Trace also stated that he did not initiate contact with APS.

[12]The trusts at issue in that lawsuit were the "Kendall Kaye Ledbetter 2010 Grantor Trust No. 2" and the "Lonnie K. Ledbetter III 2010 Grantor Trust No. 2."

devised eighty percent of his residuary estate to Tawni and twenty percent of his residuary estate to the Foundation.[13]

As to the disinheritance of Trace and Kendall, one of Lonnie's estate-planning attorneys, Colin Murchison, stated that Lonnie was "very upset" that Trace and Kendall had "abandoned him." Murchison testified that Lonnie had told him that he did not want to include his children and his grandchildren in his will because "he [had] already provided for them and he had gotten very upset [with] the way they were treating Tawni." Murchison stated that he thought that "the APS investigation was sort of the tip of the iceberg or the straw that broke the camel's back."

Apart from changing his will, Lonnie also made changes regarding the Ledbetter Trusts following his marriage to Tawni. On September 18, 2024, Lonnie signed documents appointing Tawni as the successor trustee of the Ledbetter Trusts to serve upon his death.

Lonnie died in April 2025 at the age of eighty-two.

## F. Procedural History

On the day that Lonnie died, Trace and Kendall filed their original petition in the County Court of Hood County. Through that petition, they sought a declaration that "Lonnie lacked the requisite mental and testamentary capacity to sign any documents related to his properties, his entities, his Estate, any Trust, and his

---

[13]At some point, the name of the Foundation changed from "The Lonnie and Saundra Ledbetter Family Foundation" to "The Ledbetter Foundation."

Foundation from December 1, 2023, to his death" and that "Lonnie was unduly influenced by Tawni to sign numerous documents [from] December 1, 2023, until his death and would not have executed the documents but for the undue influence." Trace and Kendall also sought the appointment of a temporary administrator, and they requested a temporary restraining order and a temporary injunction. In their petition, they also requested the appointment of a statutory probate judge to hear the case.[14] *See* Tex. Est. Code Ann. § 32.003. That same day, the County Court signed a temporary restraining order.[15]

On May 2, 2025, the County Court of Hood County transferred the case to the County Court at Law of Hood County, finding that the case involved "contested issues." On May 7, 2025, the Hood County Court at Law held a hearing. During that hearing, the Hood County Court at Law addressed an argument that had been raised by Tawni regarding the court's jurisdiction, and it also addressed Tawni's argument that the temporary restraining order should be amended to allow for the payment of certain expenses to maintain the assets in the Ledbetter Trusts. The court stated that it was going to extend the temporary restraining order and have the case assigned to a statutory probate judge. Later that day, the Hood County Court at Law signed an

---

[14]In an amended petition, Trace and Kendall requested that a 2015 will executed by Lonnie and a 2021 codicil executed by him be admitted to probate.

[15]A copy of that temporary restraining order does not appear in the appellate record although other documents reference it.

14

order extending the temporary restraining order for fourteen days. In its order, the court stated that Tawni was entitled to spend an amount not to exceed $300,000 on necessary expenses to maintain the assets of Lonnie's estate and the Ledbetter Trusts.

On May 9, 2025, the judge of the Hood County Court at Law signed an order of voluntary recusal. In that order, the judge asked that the Presiding Judge of the Eighth Administrative Judicial Region assign another judge to preside over the case. On May 14, 2025, the Presiding Judge of the Statutory Probate Courts of Texas signed an order appointing Nicholas Chu, a statutory probate judge, "to preside over the contested matters in [this case], with all rights, powers[,] and privileges held by the regular judge of the court assigned and the attendant jurisdiction of a Statutory Probate Court."[16]

Tawni filed a plea to the jurisdiction and an amended plea to the jurisdiction. In her amended plea, Tawni argued that the Hood County Court at Law lacked subject matter jurisdiction over Trace and Kendall's trust claims. She also argued that the appointment of Judge Chu did not give the Hood County Court at Law jurisdiction over the trust claims. On May 20, 2025, Judge Chu conducted a hearing to consider Tawni's amended plea to the jurisdiction. During that hearing, Judge Chu stated that Section 32.003 of the Estates Code "applies in this case because the

---

[16]That order referenced "a request from the 8th Administrative Regional Judge" that "a necessity exists for the appointment of a Statutory Probate Court Judge to preside . . . in [this case]."

15

County Court at Law does not have original probate jurisdiction for probate proceedings." *See* Tex. Est. Code Ann. § 32.003. He further stated that Estates Code Section 32.003(e) applies and grants him the same jurisdiction and authority as a statutory probate court, which "includes trust matters" under Sections 32.006 and 32.007. *See id.* §§ 32.003(e), .006, .007. Judge Chu later signed an order denying Tawni's amended plea to the jurisdiction.

On May 21, 2025, Judge Chu conducted a temporary injunction hearing. Several witnesses testified.[17] After the hearing, Judge Chu signed the temporary injunction order, restraining Tawni (and others) from taking certain actions regarding various assets and funds belonging to Lonnie's estate and to the Ledbetter Trusts.[18] This accelerated appeal followed.[19] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4).

---

[17]We have already discussed the pertinent testimony from the temporary injunction hearing during our recitation of the factual background of this case.

[18]We will detail the temporary injunction order more fully in our analysis of Tawni's second issue.

[19]On June 6, 2025, Judge Chu signed an order—on his own motion—appointing a receiver over the assets of the Ledbetter Trusts. That order gave the receiver certain powers, including the power to "pay all reasonable and ordinary expenses associated with owning, controlling, insuring, protecting[,] and operating the Ledbetter Trusts' assets." Tawni has challenged that order in a separate appeal pending before our court in Cause No. 02-25-00326-CV.

16

## III. DISCUSSION

## A. Tawni's Complaint Regarding the Trial Court's Jurisdiction

In her first issue, Tawni argues that the trial court lacks jurisdiction over the trust claims, and thus the temporary injunction order should be vacated because it is based on the trust claims. Tawni also contends that Judge Chu—a statutory probate judge—could not have been appointed to preside over the trust claims in the Hood County Court at Law.

### 1. Standard of Review

Subject matter jurisdiction is essential to a court's power to decide a case. *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 352 (Tex. 2024). Whether a particular court has subject matter jurisdiction is a question of law that we review de novo. *City of Mineral Wells v. QAR Indus., Inc.*, No. 02-25-00002-CV, 2025 WL 2552346, at *4 (Tex. App.—Fort Worth Sept. 4, 2025, no pet. h.) (mem. op.). In making that determination, we do not consider the merits of the case, but we instead look to the pleadings and any evidence relevant to the jurisdictional inquiry. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *In re Commitment of Burd*, 612 S.W.3d 450, 458 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). We determine jurisdiction on a claim-by-claim basis. *San Jacinto River Auth. v. City of Conroe*, 688 S.W.3d 124, 133 (Tex. 2024).

17

## 2. Applicable Law

The Texas court system has been described as "one of the most complex in the United States, if not the world." *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 304 (Tex. 2010) (orig. proceeding) (citing George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 367 (1977)). The Texas Supreme Court has voiced "concerns over the difficulties created for the bench, the bar, and the public by the patchwork organization of Texas' several trial courts." *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 449 (Tex. 1996). The "patchwork" organization of Texas trial courts is further muddled when, as here, probate issues are involved. As we have previously noted, "Texas probate jurisdiction is, to say the least, somewhat complex." *Est. of Stavron*, No. 02-20-00404-CV, 2021 WL 5227081, at *2 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (citing *Palmer v. Coble Wall Tr. Co.*, 851 S.W.2d 178, 180 n.3 (Tex. 1992)).

With that complexity in mind, we lay out the various statutes that converge in our understanding of the trial court's subject matter jurisdiction.

### a. The Law Concerning Original Probate Jurisdiction

Section 32.002 of the Texas Estates Code establishes the original jurisdiction for probate proceedings. *See* Tex. Est. Code Ann. § 32.002. That jurisdiction depends on whether a county has a statutory probate court or a county court at law exercising

original probate jurisdiction.[20] *See id.* Under Section 32.002(a), "In a county in which there is no statutory probate court or county court at law exercising original probate jurisdiction, the county court has original jurisdiction of probate proceedings." *Id.* § 32.002(a). Section 32.002(b) provides, "In a county in which there is no statutory probate court, but in which there is a county court at law exercising original probate jurisdiction, the county court at law exercising original probate jurisdiction and the county court have concurrent original jurisdiction of probate proceedings, unless otherwise provided by law." *Id.* § 32.002(b). Section 32.002(c) states, "In a county in which there is a statutory probate court, the statutory probate court has original jurisdiction of probate proceedings." *Id.* § 32.002(c).

### b. The Law Concerning Jurisdiction Over Trusts

Under Section 115.001(a) of the Texas Property Code, unless there is an exception listed in Section 115.001(d), the general rule is that "a district court has original and exclusive jurisdiction over all proceedings by or against a trustee and all proceedings concerning trusts." Tex. Prop. Code Ann. § 115.001(a). Section 115.001(d) provides that the jurisdiction of the district court is exclusive except for

---

[20]Hood County does not have a statutory probate court. *See generally* Tex. Gov't Code Ann. § 25.1132. The parties dispute whether the Hood County Court at Law is a court exercising original probate jurisdiction. Tawni contends that the Hood County Court at Law exercises original probate jurisdiction; Trace and Kendall argue that it does not. As we will discuss later in our analysis, we need not address this issue. *See* Tex. R. App. P. 47.1.

jurisdiction conferred by law on certain courts, including a statutory probate court and a county court at law. *Id.* § 115.001(d).

### c. The Law Concerning the Jurisdiction of County Courts at Law

County courts at law—which are distinct from the constitutional county court in each county—are "creatures of statute with varying jurisdiction individually demarcated by the [Texas] Legislature." *Ditech Servicing, LLC v. Perez*, 669 S.W.3d 188, 190 (Tex. 2023); *see* Tex. Gov't Code Ann. § 25.0003(a). The jurisdiction of county courts at law is generally prescribed by Section 25.0003 of the Texas Government Code. *Ditech Servicing, LLC*, 669 S.W.3d at 190–91; *see* Tex. Gov't Code Ann. § 25.0003. Section 25.0003(a) provides that a county court at law "has jurisdiction over all causes and proceedings, civil and criminal, original and appellate, prescribed by law for county courts." Tex. Gov't Code Ann. § 25.0003(a). Section 25.0003(d) provides that, except as provided by Section 25.0003(e),[21] a county court at law has "concurrent with the county court, the probate jurisdiction provided by general law for county courts." *Id.* § 25.0003(d). Section 25.0003(f) states that a county court at law "does not have the jurisdiction of a statutory probate court granted statutory probate courts by the Estates Code." *Id.* § 25.0003(f).

---

[21]Section 25.0003(e) states, "In a county that has a statutory probate court, a statutory probate court is the only county court created by statute with probate jurisdiction." *Id.* § 25.0003(e).

20

### d. The Law Concerning the Jurisdiction of the Hood County Court at Law

Section 25.1132 of the Government Code is a statute specific to the jurisdiction of the Hood County Court at Law. *See id.* § 25.1132. Section 25.1132(a) states, "In addition to the jurisdiction provided by [Government Code] Section 25.0003 and other law, a county court at law in Hood County has the jurisdiction provided by this section." *See id.* § 25.1132(a). Pursuant to Section 25.1132(c)(2), the Hood County Court at Law has concurrent jurisdiction with the district court in contested probate matters under Section 32.003(a) of the Texas Estates Code. *Id.* § 25.1132(c)(2); *see* Tex. Est. Code Ann. § 32.003(a). Section 32.003(a) of the Estates Code provides,

> In a county in which there is no statutory probate court or county court at law exercising original probate jurisdiction, when a matter in a probate proceeding is contested, the judge of the county court may, on the judge's own motion, or shall, on the motion of any party to the proceeding, according to the motion:
>
> > (1) request the assignment of a statutory probate court judge to hear the contested matter, as provided by Section 25.0022, Government Code; or
> >
> > (2) transfer the contested matter to the district court, which may then hear the contested matter as if originally filed in the district court.

Tex. Est. Code Ann. § 32.003(a).

Turning back to the statute specific to the jurisdiction of the Hood County Court at Law, Government Code Section 25.1132(e) states that "[e]xcept as provided

by Subsection (c)(3) or (4), a county court at law does not have probate jurisdiction."[22]

Tex. Gov't Code Ann. § 25.1132(e).

### e. The Law Concerning the Assignment of a Statutory Probate Court Judge

Pursuant to Government Code Section 25.0022(h), a statutory probate court judge may be assigned by the presiding judge of the statutory probate courts to hold court in a "statutory probate court, a county court, or any statutory court exercising probate jurisdiction" when certain conditions are met. *Id.* § 25.0022(h). One of those conditions is when "the presiding judge of an administrative judicial district requests the assignment of a statutory probate judge to hear a probate matter in a county court or statutory county court." *Id.* § 25.0022(h)(5). Another condition is when "a county court judge requests the assignment of a statutory probate judge to hear a probate matter in the county court." *Id.* § 25.0022(h)(7). Pursuant to Government Code Section 25.0022(i), "A judge assigned under this section has the jurisdiction, powers, and duties given by Sections 32.001, 32.002, 32.003, 32.005, 32.006, 32.007, 34.001, 1022.001, 1022.002, 1022.003, 1022.005, 1022.006, and 1022.007, Estates Code, to statutory probate court judges by general law."[23] *Id.* § 25.0022(i).

---

[22]The statute seemingly contains an error because while Section 25.1132 has a Subsection (c)(3), it does not have a Subsection (c)(4). *See* Tex. Gov't Code Ann. § 25.1132(c).

[23]Section 32.006 provides that "[i]n a county in which there is a statutory probate court, the statutory probate court has jurisdiction" of "an action by or against a trustee" and "an action involving an inter vivos trust, testamentary trust, or

As noted above, pursuant to Section 32.003(a) of the Estates Code, the judge of a county court may—when there is no statutory probate court or county court at law exercising original probate jurisdiction—request the assignment of a statutory probate court judge to hear the contested matter. Tex. Est. Code Ann. § 32.003(a). Section 32.003(e) provides, "A statutory probate court judge assigned to a contested matter in a probate proceeding or to the entire proceeding under this section has the jurisdiction and authority granted to a statutory probate court by this subtitle." *Id.* § 32.003(e).

### 3. Analysis

Tawni contends that the Hood County Court at Law lacks jurisdiction over the trust claims. Citing Section 115.001(a) of the Property Code, Tawni argues that only a district court has jurisdiction over the trust claims. *See* Tex. Prop. Code Ann. § 115.001(a). She contends that the Hood County Court at Law's jurisdiction is limited to "contested probate matters"—*see* Tex. Gov't Code Ann. § 25.1132(c)—and that because the trust claims are not "probate matters," the Hood County Court at Law lacks jurisdiction to hear the trust claims.

Trace and Kendall argue that Tawni's analysis overlooks other statutes giving the trial court jurisdiction, namely Estates Code Section 32.003 and Government

---

charitable trust." Tex. Est. Code Ann. § 32.006. Pursuant to Section 32.007, a statutory probate court has concurrent jurisdiction with a district court in, among other things, an action by or against a trustee and an action involving an inter vivos trust, testamentary trust, or charitable trust. *Id.* § 32.007(2), (3).

23

Code Section 25.0022. *See* Tex. Est. Code Ann. § 32.003; Tex. Gov't Code Ann. § 25.0022. We now turn to Government Code Section 25.0022 to analyze whether the trial court has jurisdiction over the trust claims under that statute.

Pursuant to Section 25.0022(h)(5), a statutory probate judge may be assigned by the presiding judge of the statutory probate courts to hold court in a statutory court exercising probate jurisdiction when "the presiding judge of an administrative judicial district requests the assignment of a statutory probate judge to hear a probate matter in a county court or statutory county court." Tex. Gov't Code Ann. § 25.0022(h)(5). That is what occurred here: the Presiding Judge of the Statutory Probate Courts of Texas, following a request from the Presiding Judge of the Eighth Administrative Judicial Region, signed an order assigning Judge Chu to preside over the contested probate matters in this case, together with the attendant jurisdiction of a statutory probate court.[24]

By virtue of his assignment under Section 25.0022(h)(5), Judge Chu possessed "the jurisdiction, powers, and duties given by Sections 32.001, 32.002, 32.003, 32.005, 32.006, 32.007, 34.001, 1022.001, 1022.002, 1022.003, 1022.005, 1022.006, and 1022.007, Estates Code, to statutory probate court judges by general law."[25] *Id.*

---

[24]That order stated that it was made "[p]ursuant to the provisions of Section 25.0022 of the Texas Government Code."

[25]Tawni argues in her reply brief that Section 25.0022(h)(5) is a "dead end" because it authorizes the assignment of a statutory probate judge "to hear a probate matter." *See id.* § 25.0022(h)(5). According to Tawni, because the trust claims are not

24

§ 25.0022(i). Section 32.007 of the Estates Code provides that a statutory probate court has concurrent jurisdiction with the district court in "an action by or against a trustee" and "an action involving an inter vivos trust, testamentary trust, or charitable trust, including a charitable trust as defined by Section 123.001, Property Code." Tex. Est. Code Ann. § 32.007. That jurisdiction includes the ability to hear the trust actions at issue in this case. *See id.*

Thus, while Judge Chu was assigned to hear the underlying probate matter pursuant to Government Code Section 25.0022, his jurisdiction did not stop there. Because he also had the "jurisdiction, powers, and duties" given by Estates Code Section 32.007[26]—a section that gave him concurrent jurisdiction with the district

---

"probate matters," Judge Chu does not have jurisdiction over them. Tawni's analysis, however, ignores Section 25.0022(i), which expressly gives judges assigned under Section 25.0022 additional "jurisdiction, powers, and duties." *See id.* § 25.0022(i). Moreover, the underlying case does involve probate matters. In their petition, Trace and Kendall requested the appointment of a temporary administrator. And in an amended petition, they asked that a 2015 will and a 2021 codicil be admitted to probate.

[26]In her reply brief, Tawni contends that "the only potentially relevant part of the Estates Code" mentioned by Government Code Section 25.0022(i) is Estates Code Section 32.006. Tawni argues extensively in both her opening brief and in her reply brief that Section 32.006 does not apply in Hood County because the introductory phrase of Section 32.006 seemingly implies that it applies only "[i]n a county in which there is a statutory probate court." *See* Tex. Est. Code Ann. § 32.006. Even if we accepted that argument—that Section 32.006 does not apply in this case—Tawni ignores the fact that Judge Chu also had "the jurisdiction, powers, and duties" given by Estates Code Section 32.007, which gave him jurisdiction over "an action by or against a trustee" and "an action involving an inter vivos trust, testamentary trust, or charitable trust." *See* Tex. Gov't Code Ann. § 25.0022(i); Tex. Est. Code Ann. § 32.007(2), (3).

25

court in matters involving trusts—the Hood County Court at Law also had jurisdiction over the trust claims.[27] *See* Tex. Gov't Code Ann. § 25.0022(i); Tex. Est. Code Ann. § 32.007.

[27]Trace and Kendall also contend that the trial court has jurisdiction over the trust claims pursuant to Section 32.003(e) of the Estates Code. *See* Tex. Est. Code Ann. § 32.003(e). In their original petition, Trace and Kendall requested the assignment of a statutory probate judge pursuant to Estates Code Section 32.003. Section 32.003(a)(1) provides that "[i]n a county in which there is no statutory probate court or county court at law exercising original probate jurisdiction," when a probate matter is contested, "the judge of the county court . . . shall, on the motion of any party to the proceeding, . . . request the assignment of a statutory probate court judge to hear the contested matter." *Id.* § 32.003(a)(1). Despite Trace and Kendall's request for the assignment of a statutory probate judge in their original petition, the Hood County Court did not request the assignment of one—rather, the Hood County Court transferred the case to the Hood County Court at Law, and eventually, Judge Chu was assigned to this case.

Despite the fact that the request for the assignment of Judge Chu did not come from the Hood County Court, Trace and Kendall maintain that Estates Code Section 32.003(e) provides Judge Chu with jurisdiction over the trust claims. That Section provides that "a statutory probate court judge assigned to a contested matter in a probate proceeding or to the entire proceeding under this section has the jurisdiction and authority granted to a statutory probate court by this subtitle." *Id.* § 32.003(e). That jurisdiction includes the ability to hear trust claims pursuant to Estates Code Section 32.007. *See id.* § 32.007.

We need not decide whether the trial court has jurisdiction over the trust claims pursuant to Estates Code Section 32.003(e)—and thus we need not decide the questions that arise from that analysis such as whether Section 32.003(e) applies despite the fact that the Hood County Court did not request the assignment of a statutory probate judge and whether the Hood County Court at Law exercises original probate jurisdiction—because, as described above, the trial court has jurisdiction over the trust claims pursuant to Government Code Section 25.0022(i). *See* Tex. R. App. P. 47.1.

26

We overrule Tawni's first issue.[28]

## B. Tawni's Complaint Regarding the Temporary Injunction Order

In her second issue, Tawni argues that the trial court abused its discretion by issuing the temporary injunction order. Tawni's second issue can be broken into four complaints: (1) the order is vague; (2) there is no evidence of irreparable harm; (3) even if there is some evidence of irreparable harm, the order is nevertheless void because it is overbroad; and (4) there is no evidence of a probable right to relief.

### 1. Standard of Review

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). To obtain a temporary injunction, an applicant must plead and prove three elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a

---

[28]Trace and Kendall also argue that the trial court has jurisdiction over the trust claims due to pendent and ancillary jurisdiction. *See* Tex. Est. Code Ann. § 32.001(b) ("A probate court may exercise pendent and ancillary jurisdiction as necessary to promote judicial efficiency and economy."). Because we have already determined that the trial court has jurisdiction over the trust claims pursuant to Government Code Section 25.0022(i)—which gives the trial court the jurisdiction over trusts contained in Estates Code Section 32.007—we need not consider whether the trial court also has pendent and ancillary jurisdiction over the trust claims. *See* Tex. R. App. P. 47.1.

probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

We review a trial court's grant of a temporary injunction for an abuse of discretion. *Spain v. ManPow, LLC*, No. 02-24-00154-CV, 2025 WL 1271957, at \*3 (Tex. App.—Fort Worth May 1, 2025, no pet.) (mem. op.); *see Butnaru*, 84 S.W.3d at 204. The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru*, 84 S.W.3d at 204; *see also Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 215 (Tex. App.—Fort Worth 2021, no pet.) ("As the appellate court, our job is not to second-guess a trial court's discretionary decision to issue a temporary injunction. Instead, our job is to make sure that the trial court had the legal authority, and thus discretion, to issue an injunction at all."). At a temporary injunction hearing, the trial court judges the credibility of the witnesses and assigns the weight to be given to their testimony. *Malcom v. Cobra Acquisitions, LLC*, No. 07-19-00405-CV, 2020 WL 2089337, at \*5 (Tex. App.—Amarillo Apr. 30, 2020, no pet.) (mem. op.); *see Regal Ent. Grp. v. iPic-Gold Class Ent., LLC*, 507 S.W.3d 337, 352 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We view the evidence in the light most favorable to the trial court's temporary injunction order and indulge every reasonable inference in its favor. *Spain*, 2025 WL 1271957, at \*3. We defer to the trial court's resolution of fact issues; however, we review the trial court's application of the law to established facts and the resolution of pure legal questions de novo. *Id.*

28

## 2. The Complained-of Order

The trial court's temporary injunction order states, in pertinent part, that

[Trace and Kendall] have shown a probable right to relief on the merits of their claims.

. . . . [Trace and Kendall] have demonstrated that, unless Tawni is temporarily enjoined as described below, [Trace and Kendall], the Estate of Lonnie Ledbetter, the Lonnie and Saundra Ledbetter Family Foundation a/k/a The Ledbetter Family Foundation (the "Foundation") and Lonnie's various family trusts—as defined below—will suffer imminent and irreparable injury[ ] because they have no adequate remedy at law: the assets at issue are unique, currently listed for sale, may be lost forever, and cannot be remedied or adequately compensated through damages: and because there is evidence that Tawni would be judgment proof or not have adequate assets to satisfy a judgment against her concerning the assets subject to this Temporary Injunction. The Court finds that each of these constitutes probable imminent and irreparable injury independently, and both independently and jointly these support the issuance of the requested temporary injunction.

. . . .

IT IS THEREFORE ORDERED that the Clerk of this Court issue a Temporary Injunction, operative until final judgment, restraining Tawni and each of her agents, employees, attorneys, representatives, or other persons in active concert or participation with her who receives actual notice of this Temporary Injunction from:

1. Accessing, withdrawing, transferring, distributing, spending, encumbering, conveying, depleting, concealing, or comingling funds held in any account in which Lonnie and/or his Estate holds an interest, including but not limited to accounts at Charles Schwab (including but not limited to Accounts #XXXX-5857, #XXXX-6931, #XXXX-4869, #XXXX-2949, #XXXX-4245, and #XXXX-8871), Bank of America (including but not limited to Accounts #XXXXXX2432 and #XXXXXXXX9471), JPMorgan Chase (including but not limited to Account #XXXXXX1176), First National Bank Granbury; (including but not limited to Account #4725); and Raymond James[;]

29

2.   Spending, pledging, contracting with, transferring, conveying, encumbering, depleting, concealing or comingling any assets that Tawni has received from Lonnie, any entity in which Lonnie owned any interest, or any Trust that Lonnie was a trustee or beneficiary of[;]

3.   Accessing, withdrawing, transferring, distributing, spending, encumbering, conveying, depleting, concealing, or comingling funds held in any account in [sic] which holds assets belonging to (a) the Community Property Trust created under the Fifth Amended and Restated Trust Agreement Creating the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust; (b) the Exempt Family Trust created under the Fifth Amended and Restated Trust Agreement Creating the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust; (c) the Marital Trust created under the Fifth Amended and Restated Trust Agreement Creating the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust; or (d) the Fifth Amended and Restated Trust Agreement Creating the Lonnie K. Ledbetter, Jr. (collectively, the "Ledbetter Trusts");

4.   Spending, pledging, contracting with, transferring, conveying, encumbering, depleting, concealing[,] or comingling any assets that Tawni has received from the Ledbetter Trusts;

5.   Accessing, withdrawing, transferring, distributing, spending, encumbering, conveying, depleting, concealing, or comingling funds held in any account in [sic] which holds assets belonging to Saundra Ledbetter or the Estate of Saundra Ledbetter;

6.   Spending, pledging, contracting with, transferring, conveying, encumbering, depleting, concealing[,] or comingling any assets that Tawni has received from the Estate of Saundra Ledbetter, any entity in which Saundra Ledbetter owned any interest, or any Trust that Saundra Ledbetter was a trustee or beneficiary of;

7.   Accessing, withdrawing, transferring, distributing, spending, encumbering, conveying, depleting, concealing, or comingling assets or funds belonging to the Jones-Ledbetter Family Revocable Trust; and

8.   Accessing, withdrawing, transferring, distributing, spending, encumbering, conveying, depleting, concealing, or comingling funds held in any account in [sic] which holds assets belonging to the Foundation.

### 3. Tawni's Complaint That the Order Is Vague

Tawni contends that the temporary injunction order violates Rule 683 because it is "impermissibly vague."

#### a. Applicable Law

Rule 683 states that an injunction order "shall be specific in terms" and "shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." Tex. R. Civ. P. 683. "An injunction should inform the enjoined party of the acts he is restrained from doing without calling on him for inferences or conclusions about which persons might well differ and without leaving anything further for trial." *SISU Energy, LLC v. Hartman*, No. 02-19-00436-CV, 2020 WL 4006725, at *15 (Tex. App.—Fort Worth July 16, 2020, no pet.) (mem. op.). "That is, there can be no doubt about the conduct required to comply with the order, nor can there be any doubt about the conduct that would be a failure to comply with the order." *Premier Trailer Leasing, Inc. v. GTR Rental L.L.C.*, No. 02-09-00449-CV, 2011 WL 1901980, at *2 (Tex. App.—Fort Worth May 19, 2011, no pet.) (mem. op.). An injunction order, however, "is not required to specify each and every possible act that might constitute a violation," and it "must be in broad enough terms to prevent repetition of the evil sought to be stopped." *Bellefeuille v. Equine Sports Med. & Surgery, Weatherford Div., PLLC*, No. 02-15-00268-CV,

2016 WL 1163364, at *7 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.) (internal quotation omitted).

Rule 683's requirements are mandatory, and they must be strictly followed. *SISU Energy, LLC*, 2020 WL 4006725, at *14. A trial court abuses its discretion when it issues a temporary injunction order that does not conform to Rule 683. *Id.* When a temporary injunction order does not meet Rule 683's requirements, it is subject to being declared void and dissolved. *Id.* When determining whether a temporary injunction order is sufficiently specific to comply with Rule 683, we look no further than the order itself. *Spain*, 2025 WL 1271957, at *4.

### b. Analysis

Here, Tawni argues that the temporary injunction order violates Rule 683 because it makes vague references to "assets" and "funds" without identifying the enjoined assets or funds. Similarly, she contends that the order's vague references to "accounts" without identifying the accounts with specificity also violate Rule 683. Trace and Kendall counter that the temporary injunction order does identify and define "the various accounts, estates, trusts, and foundations involved." According to Trace and Kendall, the injunction "tells Tawni exactly what she cannot do."

Having reviewed the temporary injunction order, we agree with Tawni that it does not inform her of the acts that she is restrained from doing without calling on her to make inferences or conclusions about which persons might well differ. *See SISU Energy, LLC*, 2020 WL 4006725, at *15.

32

The first paragraph of the enjoined activities prevents Tawni and others from taking certain actions "held in any account in which Lonnie and/or his Estate holds an interest, including but not limited to" certain specified accounts. But that language requires Tawni (and others) to make inferences or conclusions as to what accounts fit this description. While certain specific accounts are listed in the injunction, the order reaches beyond those listed accounts, stating that it applies to "any account . . . including but not limited to."

In *Contract Datascan Holdings, Inc. v. Retail Services WIS Corporation*, we considered whether the use of the phrase "including, but not limited to" in an injunction order lacked the specificity required by Rule 683. No. 02-23-00153-CV, 2023 WL 7851509, at \*33–35 (Tex. App.—Fort Worth Nov. 16, 2023, no pet.) (mem. op.). We looked at other cases addressing the use of that phrase in an injunction order, and we noted, "It appears that the distinction between the permissible and impermissible use of the phrase lies in whether the phrase increases clarity or increases confusion." *Id.* at \*34. We stated that "[w]hen the phrase clarifies by giving examples to explain a generalized category that is made sufficiently specific when read in the context of the evidence in the record, it is permissible." *Id.* But we said that "when the phrase confuses by suggesting undefined categories different than the category to which the phrase is appended, it is impermissible." *Id.*

As an example of the second category—where the use of the phrase created an ambiguity in violation of the specificity requirement of Rule 683—we cited *In re*

33

*Krueger*, No. 03-12-00838-CV, 2013 WL 2157765 (Tex. App.—Austin May 16, 2013, orig. proceeding) (mem. op.). *Cont. Datascan Holdings, Inc.*, 2023 WL 7851509, at *34 (citing *Krueger*, 2013 WL 2157765, at *3). In *Krueger*, the injunction prohibited an individual from "making or initiating any withdrawals or transfers from any of Cru Energy, Inc. bank accounts, including, but not limited to, the Wells Fargo Account as defined in Plaintiff's Original Petition." 2013 WL 2157765, at *1. The Austin Court of Appeals stated that this language violated Rule 683 because it "fail[ed] to describe in reasonable detail the other accounts that Krueger [was] enjoined from accessing." *Id.* at *7. That same logic applies here: the first paragraph violates Rule 683 to the extent that it enjoins actions pertaining to accounts that are not reasonably identified. *See* Tex. R. Civ. P. 683; *Zurovec v. Rueben*, No. 09-21-00379-CV, 2022 WL 3650128, at *11 (Tex. App.—Beaumont Aug. 25, 2022, no pet.) (mem. op.) ("Enjoined parties should be able to review a temporary injunction order, understand it, and not guess about what they are prohibited from doing upon threat of contempt.").

The second paragraph of the enjoined activities prevents Tawni and others from taking certain actions regarding "any assets that Tawni has received from Lonnie, any entity in which Lonnie owned any interest, or any Trust that Lonnie was a trustee or beneficiary of." Similarly, the fourth paragraph prevents Tawni and others from taking certain actions regarding "any assets that Tawni has received from the Ledbetter Trusts." Likewise, the sixth paragraph prevents Tawni and others from taking certain actions regarding "assets that Tawni has received from the Estate of

34

Saundra Ledbetter, any entity in which Saundra Ledbetter owned any interest, or any Trust that Saundra Ledbetter was a trustee or beneficiary of." And the seventh paragraph prevents Tawni and others from taking certain actions regarding "assets or funds belonging to the Jones-Ledbetter Family Revocable Trust."

But it is unclear from the injunction what assets are being affected in those paragraphs. To that end,

- What assets has Tawni received from Lonnie?

- In what entities did Lonnie have an interest?

- What assets has Tawni received from those entities?

- In what trusts was Lonnie named a trustee or beneficiary?

- What assets has Tawni received from those trusts?

- What assets has Tawni received from the Ledbetter Trusts?

- What assets has Tawni received from the Estate of Saundra Ledbetter?

- In what entities did Saundra have an interest?

- What assets has Tawni received from those entities?

- In what trusts was Saundra named a trustee or beneficiary?

- What assets has Tawni received from those trusts?

- What assets has Tawni received from the Jones-Ledbetter Revocable Trust?

The temporary injunction order is silent on those questions,[29] forcing Tawni (and others) to make inferences and conclusions about which persons might well differ. Thus, the second, fourth, sixth, and seventh paragraphs violate Rule 683 by enjoining actions pertaining to assets that are not reasonably identified. *See* Tex. R. Civ. P. 683; *Zurovec*, 2022 WL 3650128, at *1; *see also Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, 531 S.W.3d 829, 850 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.) ("Because appellants have no clear basis to know which acts they are restrained from doing, those portions of the injunction which refer to the Distributor's or the LLC's unidentified 'growers,' 'customers,' or 'accounts' are fatally vague.").

The third paragraph of the enjoined activities prevents Tawni and others from taking certain actions regarding "funds held in any account in [sic] which hold assets belonging to" the Ledbetter Trusts. Similarly, the fifth paragraph prevents Tawni and others from taking certain actions regarding "funds held in any account in [sic] which holds assets belonging to Saundra Ledbetter or the Estate of Saundra Ledbetter." Likewise, the eighth paragraph prevents Tawni and others from taking certain actions

---

[29]In their brief, Trace and Kendall suggest that the lack of specificity in the temporary injunction order is justified because "Tawni refused to provide [them] with expedited discovery between the TRO's extension and the injunction hearing so that [they] could determine the extent and location of Lonnie's assets before the hearing." However, Trace and Kendall have not cited us to any discovery order violated by Tawni. And as pointed out by Tawni in her reply brief, the order extending the temporary restraining order stated that "all provisions in the TRO concerning expedited discovery are stricken."

regarding "funds held in any account in [sic] which holds assets belonging to the Foundation."

Once again, the temporary injunction order is unclear. What accounts hold assets belonging to the Ledbetter Trusts? What accounts hold assets belonging to Saundra Ledbetter? What accounts hold assets belonging to the Estate of Saundra Ledbetter? What accounts hold assets belonging to the Foundation? The injunction order is silent on those questions, leaving those restrained to make inferences and conclusions about what they are enjoined from doing. Thus, the third, fifth, and eighth paragraphs violate Rule 683 by enjoining actions pertaining to accounts and assets that are not reasonably identified. *See* Tex. R. Civ. P. 683; *Zurovec*, 2022 WL 3650128, at *1; *see also Cont. Datascan Holdings, Inc.*, 2023 WL 7851509, at *33 ("We conclude that the vague and general terms in paragraph b. of the injunction order fail to meet the specificity requirements of Rule 683 and potentially improperly restrain the [former employees] from lawful activities.").

We sustain this part of Tawni's second issue.

### 4. Tawni's Complaint That There Is No Evidence of Irreparable Harm

Tawni also argues that the temporary injunction order should be reversed or voided because there is no evidence of irreparable harm.

#### a. Applicable Law

Rule 683 requires that a temporary injunction order state precisely why the applicant would suffer irreparable harm. *SISU Energy, LLC*, 2020 WL 4006725, at

*14. An unsupported or conclusory statement in the order that irreparable harm will occur is insufficient to satisfy Rule 683. *Id.*

For purposes of a temporary injunction, "[a]n injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. A plaintiff does not have an adequate remedy at law if the defendant is insolvent. *Kirkland v. Kirkland*, No. 02-22-00469-CV, 2023 WL 3643642, at *11, *13 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.); *see Huynh v. Blanchard*, 694 S.W.3d 648, 682 n.46 (Tex. 2024) (collecting cases). Moreover, "money damages may be inadequate to compensate an injured party for the loss of property deemed to be legally 'unique' or irreplaceable." *Forrest Prop. Mgmt., Inc. v. Forrest*, No. 10-09-00338-CV, 2010 WL 2869820, at *3 (Tex. App.—Waco July 21, 2010, no pet.) (mem. op.).

### b. Analysis

The trial court articulated two reasons for irreparable harm in the temporary injunction order: (1) the underlying assets are unique, and (2) Tawni would be judgment proof or not have adequate assets to satisfy a judgment against her concerning the underlying assets. Tawni argues that neither of these reasons is supported by the record.

In their brief, Trace and Kendall offer a third justification for irreparable harm—that Tawni will dissipate specific funds that would otherwise be available to satisfy a judgment. Tawni argues that we may not consider this justification because it

38

was not explicitly mentioned by the trial court in the temporary injunction order. We disagree.

While the trial court did not specifically articulate this reason in the temporary injunction order, when reviewing the particulars of a temporary injunction, we are not limited to the reasons articulated by the trial court. *See Est. of Shultz*, No. 11-21-00177-CV, 2022 WL 4099404, at \*3 (Tex. App.—Eastland Sept. 8, 2022, no pet.) (mem. op.); *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 298 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *Loomis Intern., Inc. v. Rathburn*, 698 S.W.2d 465, 467 (Tex. App.—Corpus Christi–Edinburg 1985, no writ); *Erickson v. Rocco*, 433 S.W.2d 746, 750 (Tex. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). Indeed, because a trial court cannot abuse its discretion by reaching a correct result for an improper reason, we will uphold a trial court's order on any ground that finds support in the record. *Est. of Shultz*, 2022 WL 4099404, at \*3; *Hsin-Chi-Su*, 474 S.W.3d at 298. Moreover, while the trial court did not specifically refer to Tawni's dissipation of assets in the temporary injunction order, that theory is closely associated with the insolvency ground stated by the trial court.[30] *See Kirkland*, 2023 WL 3643642, at \*13 (discussing insolvency in conjunction with discussion of dissipation of assets); *Marshall v. Marshall*, No. 14-17-00930-CV, 2021 WL 971309, at \*5 (Tex. App.—Houston [14th Dist.] Mar. 16, 2021, no pet.) (mem. op.) (similar).

---

[30]Indeed, in her reply brief, Tawni states that the dissipation of assets "theory requires evidence of *insolvency*."

We thus begin our analysis with whether Tawni's dissipation of specific funds provides evidence of irreparable harm. "[E]ven if damages are subject to a precise calculation, an injunction will lie to prevent the dissipation of specific funds that would otherwise be available to pay a judgment." *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 764 (Tex. App.—Texarkana 2017, pet. dism'd); *see Kirkland*, 2023 WL 3643642, at *11; *Minexa Ariz., Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex. App.—Dallas 1984, no writ).

Here, evidence was presented at the injunction hearing that Tawni handled Lonnie's finances after the marriage.[31] According to Sinks, Tawni's handling of Lonnie's finances was inconsistent with Lonnie's character prior to the marriage. After the marriage, Lonnie made several large purchases, including buying a jet and a yacht.[32] Tawni purchased property in Florida after the marriage worth approximately $6 million. Although she initially testified that she had "never received any money from Lonnie or any of his entities to purchase" the Florida property, she later stated that she had used money that had been given to her by Lonnie or his entities to purchase the Florida property, noting that "[s]everal million dollars" was used.

---

[31]Testimony was presented indicating that Lonnie's liquid assets in the third quarter of 2023 were "between [$]30 and $40 million."

[32]Tawni estimated that the jet cost "[m]aybe six or seven million" and that the yacht cost "[a]round $5 million . . . or something."

Notably, a ranch owned by both Lonnie and Tawni was listed for sale for approximately $18 million after the marriage.[33]

Viewing the evidence in the light most favorable to the trial court's temporary injunction order and indulging every reasonable inference in its favor, Trace and Kendall sufficiently demonstrated that they would be irreparably harmed if Tawni were not enjoined from dissipating the assets of Lonnie's estate and of the Ledbetter Trusts and that they have no adequate remedy by appeal. *See Kirkland*, 2023 WL 3643642, at *13 ("[The appellee] has no adequate remedy at law because there is some evidence that [the appellant] lacks sufficient assets to reimburse [the appellee] for the amount that the Stifel account has decreased."); *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 927 (Tex. App.—Dallas 2022, no pet.) ("Viewed in the light most favorable to the trial court's order, the evidence that appellants are selling assets and evading financial obligations supports a reasonable inference of a deteriorating financial condition that would affect appellants' ability to fully satisfy a money judgment.").

Moreover, evidence was presented from which the trial court could infer that Tawni would not have adequate assets to satisfy a judgment against her concerning the assets subject to the temporary injunction. She asserted her Fifth Amendment right against self-incrimination over twenty times at the hearing, including to basic

---

[33]Tawni testified that the ranch was listed for sale at Lonnie's direction.

questions regarding her name and date of birth, as well as to questions regarding what she had told Lonnie about her age prior to their marriage. The trial court was permitted to draw negative inferences from her repeated invocation of the Fifth Amendment. *See Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (holding that a factfinder in a civil case is "free to draw negative inferences from [a witness's] repeated invocations of the Fifth Amendment"); *Cook v. Tom Brown Ministries*, 385 S.W.3d 592, 602 (Tex. App.—El Paso 2012, pet. denied) ("In civil proceedings, a trial court may draw an adverse inference against a party who invokes the right to remain silent under the Fifth Amendment."); *see also* Tex. R. Evid. 513(c).

Tawni also admitted to having lied on numerous occasions in the past, and evidence was presented that she had lied to Lonnie about her military service and the amount of the sale of her aviation business. At the hearing, the trial court took judicial notice of a finding by a Michigan trial court regarding Tawni. That Michigan trial court found that Tawni "exaggerates on everything"; "prefabricates [and] manipulates"; and is "a con artist," a "scam artist," and a "psychopathic liar." *Jones*, 2007 WL 2051545, at *7. The trial court, as the factfinder, was free to make its own credibility determination regarding Tawni and the weight to be given to her testimony. *See Malcom*, 2020 WL 2089337, at *5; *see also Regal Ent. Grp.*, 507 S.W.3d at 352 (deferring to trial court's credibility judgments and resolution of conflicting evidence when reviewing temporary injunction order).

42

Moreover, Tawni admitted to having previously filed for bankruptcy in 2012. She stated that she was "discharged in like a year," although she could not recall whether her bankruptcy discharge was ever set aside or whether a bankruptcy trustee had ever alleged that she had concealed assets. She said that during that bankruptcy case "[t]here was some question as to whether or not a note that was paid to an entity was supposed to have been disclosed in [her] schedules," but she could not recall. In her bankruptcy filing, Tawni estimated that her assets were between $0 and $50,000. At the hearing, she admitted that during a previous deposition in litigation arising from the bankruptcy case, she had stated that she had taken $200,000 from someone else's account without his permission. As detailed above in our discussion of dissipation of assets, evidence was also presented indicating that several large purchases were made after Tawni's marriage to Lonnie—at a time when she handled his finances—including a jet, a yacht, and her purchase of property in Florida. There was also evidence that a ranch owned by Lonnie and Tawni was listed for sale for $18 million after the marriage. That evidence supports the trial court's finding of irreparable harm. *See Fischer v. Rider*, No. 02-10-00294-CV, 2011 WL 167226, at *5 (Tex. App.—Fort Worth Jan. 13, 2011, no pet.) (mem. op.) (stating that evidence in support of trial court's finding of irreparable harm included, among other things, "evidence that [corporation's] tax documents did not reflect payments to [appellant] and that payments to [appellant] were not reflected on his bankruptcy petition").

Viewing the evidence in the light most favorable to the trial court's temporary injunction order and indulging every reasonable inference in its favor, Trace and Kendall sufficiently demonstrated that they would be irreparably harmed if Tawni were not enjoined because she does not have adequate assets to satisfy a judgment against her concerning the assets subject to the temporary injunction and that they have no adequate remedy by appeal. *See Kirkland*, 2023 WL 3643642, at *13; *Twyman v. Twyman*, No. 01-08-00904-CV, 2009 WL 2050979, at *5–6 (Tex. App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by granting temporary injunction when the only way to prevent further harm to the trust was to deny trustee the ability to withdraw additional funds from trust while litigation was pending).

We overrule this aspect of Tawni's second issue.[34]

## 5. Tawni's Complaint That the Order Is Overbroad

As an alternative to her argument that there was no evidence of irreparable harm, Tawni contends that even if some irreparable harm has been shown, the temporary injunction order is nevertheless void because it is overbroad.

---

[34]Because we have determined that Trace and Kendall have sufficiently demonstrated that there is a reasonable inference that prior to trial Tawni will continue to dissipate Lonnie's assets that would otherwise pass to them and that Tawni does not have adequate assets to satisfy a judgment against her concerning the assets subject to the temporary injunction, we need not consider their argument that irreparable harm was also shown by the uniqueness of the underlying assets. *See* Tex. R. App. P. 47.1.

44

### a. Applicable Law

A trial court abuses its discretion by granting an injunction that is so broad as to enjoin a defendant from activities that are lawful or from a proper exercise of the defendant's rights. *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 65 (Tex. 2016). Nevertheless, "an injunction 'must be in broad enough terms to prevent repetition of the evil sought to be stopped.'" *Scroggins v. Buyers Barricades, Inc.*, No. 02-22-00186-CV, 2022 WL 7231833, at *6 (Tex. App.—Fort Worth Oct. 13, 2022, no pet.) (mem. op.) (quoting *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956)).

### b. Analysis

Tawni contends that the temporary injunction order is overbroad for three reasons: (1) it goes beyond what is necessary to preserve the status quo with respect to any irreparable harm, (2) it fails to account for the payment of necessary expenses needed to upkeep the various assets and to pay obligations to third parties, and (3) it enjoins the assets or funds belonging to the Jones-Ledbetter Family Revocable Trust.

We agree with Tawni's first complaint that the temporary injunction order goes beyond what is necessary to preserve the status quo with respect to any irreparable harm. As noted in our discussion of the vagueness of the injunction, the order speaks generally of "assets," "funds," and "accounts" without giving specificity to those terms. With the exception of the specifically listed accounts in the first paragraph, we hold that the temporary injunction order is overly broad to the extent that it enjoins

45

Tawni and others from activities pertaining to vaguely defined "assets," "funds," and "accounts." *See Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 72 S.W.3d 23, 34–35 (Tex. App.—Austin 2001, pet. dism'd w.o.j.) (stating that "where an injunction is proper[,] . . . it must be drawn with such specificity so as to remedy only the particular harm complained of; an injunction drawn too broadly is improper" (internal quotation omitted)).

We agree with Tawni's second complaint that the temporary injunction order fails to account for the payment of necessary expenses needed to upkeep the various assets and to pay obligations to third parties. At the hearing, evidence was presented regarding expenses and third-party obligations needed to maintain the various assets of the Ledbetter Trusts. According to the testimony, a yacht owned by the Ledbetter Trusts incurs a $70,000 monthly obligation for the yacht's crew. Testimony was also presented that the yacht would be damaged if it were not allowed to operate and that there is a monthly dockage fee of $18,000–$25,000. There was also evidence that Lonnie owned a ranch that possessed "over a hundred" horses that needed to be cared for and entered into shows to preserve their value. An exhibit was admitted at the hearing reflecting that the monthly cost to maintain the horses at the ranch was approximately $183,000.

While the trial court's temporary restraining order, as extended, provided that Tawni was entitled to spend an amount not to exceed $300,000 on necessary expenses to maintain the assets of Lonnie's estate and the Ledbetter Trusts, the temporary

46

injunction order has no such provision.[35]  Absent such a provision, we hold that the temporary injunction order is overly broad because it fails to account for the payment of necessary expenses to upkeep the various assets and to pay obligations to third parties, payments that are required to maintain the status quo.[36]  *See Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (stating that a temporary injunction "should not be so broad that it prohibits the restrained party from engaging in lawful activities that are a proper exercise of its rights"); *Lifeguard Benefit Servs., Inc. v. Direct Med. Network Sols., Inc.*, 308 S.W.3d 102, 110 (Tex. App.—Fort Worth 2010, no pet.) ("The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits.").

As to Tawni's third complaint—that the injunction enjoins assets or funds belonging to the Jones-Ledbetter Family Revocable Trust—as discussed in our analysis concerning the vagueness of the injunction, we have held that the paragraph enjoining the assets or funds belonging to the Jones-Ledbetter Family Revocable

---

[35]The trial court seemingly recognized that this would be a problem, stating at the injunction hearing, "I'm just going to grant the injunction.  It's going to be up to you guys to figure out a plan, and I want a plan ASAP because obviously she needs to expend some funds probably.  People got to get paid. . . .  But my hope is right now I'm going to grant the injunction[,] and then you guys figure out how we get everybody paid."

[36]Trace and Kendall argue that the trial court's subsequent order appointing a receiver renders Tawni's complaint on this point as "academic."  We disagree.  That order has been appealed to our court, and it remains pending.

47

Trust is not specific as to the actions enjoined, and we are reversing that portion of the temporary injunction order. We thus need not decide whether that portion is also overly broad. *See* Tex. R. App. P. 47.1.

We sustain this portion of Tawni's second issue.

### 6. Tawni's Complaint That Trace and Kendall Did Not Establish a Probable Right to Relief

Tawni further argues that the temporary injunction order should be reversed because Trace and Kendall did not establish a probable right to relief.

#### a. Applicable Law

Because a temporary injunction preserves only the status quo pending final trial, a trial court's determination regarding whether to issue a temporary injunction does not resolve the ultimate merits of the suit. *Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *6 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.) (citing *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979)). Indeed, "[t]he assumption is that the evidence may well change between the preliminary temporary-injunction stage of the proceeding and a final trial on the merits." *Id.* Thus, the probability-of-success requirement does not require applicants to show that they will prevail at final trial. *Id.* (citing *Young Gi Kim v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.)). The requirement simply necessitates that the applicants present enough evidence to raise a bona fide issue as to their ultimate relief. *Id.* Establishing

48

the right to recover on one claim is sufficient to justify preserving the status quo, regardless of other claims alleged. *Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Grp. Holdings, Inc.*, 374 S.W.3d 488, 501 (Tex. App.—Dallas 2012, pet. denied).

### b. Analysis

In their live petition, Trace and Kendall sought a declaration that (1) "Lonnie lacked the requisite mental and testamentary capacity to sign any documents related to his properties, his entities, his Estate, any Trust, and his Foundation from December 1, 2023, to his death" and (2) "Lonnie was unduly influenced by Tawni to sign numerous documents [from] December 1, 2023, until his death and would not have executed the documents but for the undue influence."[37] We begin our analysis with the second of these claims—undue influence.

---

[37]In their brief, Trace and Kendall argue that they "also pleaded breach of fiduciary duty." Thus, they contend that because they pleaded breach of fiduciary duty and because Tawni does not address that claim as a possible ground supporting the trial court's ruling, we should reject Tawni's argument that they have not shown a probable right of relief. We have reviewed Trace and Kendall's live pleading, and it does not give Tawni fair notice that they have raised a claim of breach of fiduciary duty. *See* Tex. R. Civ. P. 47(a) (requiring a petition to give "a short statement of the cause of action sufficient to give fair notice of the claim involved"). While their live petition makes one passing reference to a "breach of fiduciary duty" and another reference to "misapplication of fiduciary property," those are not delineated claims in the petition. Moreover, there are no factual allegations regarding the alleged breach of fiduciary duty, such as to whom Tawni owed a duty, how Tawni breached that duty, and whether Trace and Kendall have standing to raise that claim. We thus reject Trace and Kendall's argument that the trial court's finding of a probable right to relief is supported by a pleaded breach of fiduciary duty claim.

To establish undue influence, there must be proof of (1) the existence and exertion of an influence, (2) the effect of the influence was to subvert or overpower the mind of the testator at the time of the execution of the testament, and (3) the execution of a testament which the maker would not have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Horton v. Horton*, 965 S.W.2d 78, 87 (Tex. App.—Fort Worth 1998, no pet.). Undue influence may be shown by direct or circumstantial evidence, but it is usually established by circumstantial evidence. *Est. of Luce*, No. 02-17-00097-CV, 2018 WL 5993577, at *14 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.); *Birmingham-Queen v. Whitmire*, No. 04-05-00646-CV, 2006 WL 1539587, at *4 (Tex. App.—San Antonio June 7, 2006, no pet.) (mem. op.). While a single circumstance standing alone is insufficient to show undue influence, several circumstances, when considered together, may suffice. *Est. of Luce*, 2018 WL 5993577, at *14. "The distinction between evidence that suffices to show undue influence and that which is merely suspicious defies articulation; it essentially is a matter of degree." *Id.*

Tawni argues that Trace and Kendall "presented no evidence of undue influence." We disagree.

As to the first element—the existence and exertion of an influence—the record reflects that Lonnie became "really depressed" after Saundra died in March 2023. He began communicating with what appears to be a fake individual, "Nicole," in October 2023, and he desired to propose to "Nicole" despite having never met her.

50

By November 2023, Lonnie had moved on to Tawni, and the two of them were married in quick fashion in Oklahoma at a wedding officiated by Tawni's son. Several witnesses remarked that everything changed with Lonnie after he married Tawni.

Trace, Sinks, and Trace's wife testified to the difficulties they had contacting Lonnie after the marriage. Sinks stated that he "started being separated away from" Lonnie after the marriage and that he could not get Lonnie to speak with him. When he was able to speak with Lonnie on the phone, Tawni would get on the phone with them, and when he saw Lonnie in person, Tawni "would show up in person as soon as [he] got there." Trace stated that his ability to have access to Lonnie was greatly diminished after the marriage. When he was able to talk to Lonnie on the phone, it was on speaker phone and there were voices in the background. Trace's wife testified that Tawni would not let her see Lonnie. Evidence was also presented that Lonnie's calls to Trace, Sinks, and Trace's wife were being blocked, and Trace maintained that Lonnie did not have the technical ability to block such calls. Sinks testified that cameras were installed in Lonnie's bedroom in 2023 or 2024. Sinks also maintained that Tawni handled Lonnie's finances after the marriage, something that was inconsistent with Lonnie's character prior to the marriage.

Those facts present enough evidence to raise a bona fide issue as to the first element of undue influence. *See Morrell v. Morrell*, No. 09-20-00086-CV, 2022 WL 959943, at *14 (Tex. App.—Beaumont Mar. 31, 2022, pet. denied) (mem. op.) (holding that evidence supported finding of undue influence when evidence included

51

decedent's audio recordings discussing how son had isolated her and included son's admission that he had access to decedent's email password); *Tieken v. Midwestern State Univ.*, 912 S.W.2d 878, 886 (Tex. App.—Fort Worth 1995, no writ) (rejecting appellant's assertion that there was no evidence to support undue-influence finding when testimony reflected that decedent was isolated by appellant from friends and bookkeeper); *Gaines v. Frawley*, 739 S.W.2d 950, 953–54 (Tex. App.—Fort Worth 1987, no writ) (holding that evidence supported first element of undue influence when testimony reflected that decedent's personality had changed after appellant moved into her home, that decedent was submissive to appellant, that decedent had withdrawn from her children, and that appellant had been married seven times previously).

As to the second element—whether the effect of Tawni's influence was to subvert or overpower the mind of the testator at the time of the execution of the testament—the record reflects that Tawni engaged in deceptive behavior for her own benefit. At the temporary injunction hearing, she asserted her Fifth Amendment right against self-incrimination over twenty times, including to a question regarding whether she had ever lied to Lonnie and Trace about her age. At the hearing, Tawni admitted to having lied about her education, and she minimized those lies, stating that she had "made up fluff" about her education "to make [her]self look good in the industry that [she] was in." As noted above, the findings of a Michigan trial court were also discussed at the temporary injunction hearing. That Michigan trial court

52

found that Tawni "exaggerates on everything"; that she "prefabricates [and] manipulates"; and that she is "a con artist," a "scam artist," and a "psychopathic liar." *Jones*, 2007 WL 2051545, at *7. Audio clips were admitted at the hearing that reflect that Tawni had lied in Lonnie's presence regarding her service in the Swedish military and about the amount of the sale of her aviation business.

Moreover, evidence was presented that Lonnie was "really depressed" after Saundra died in March 2023. During that time of depression, he simultaneously pursued relationships with Tawni and the fictional "Nicole," desiring to propose marriage to "Nicole" and ultimately proposing to Tawni in December 2023. Those facts present enough evidence to raise a bona fide issue as to the second element of undue influence. *See Est. of Richardson*, No. 11-92-180-CV, 1993 WL 13141661, at *3 (Tex. App.—Eastland July 1, 1993, no writ) (not designated for publication) (holding that jury could have reasonably believed that decedent was unduly influenced when decedent "suffered from depression during this time and . . . experienced a dramatic emotional crisis when . . . her care provider [changed]").

As to the third element—whether Lonnie had executed documents that he would not have absent Tawni's influence—the record reflects that after his marriage to Tawni, Lonnie made numerous changes to the Ledbetter Trusts, including signing documents appointing Tawni as the successor trustee to serve upon his death. He also made changes to his will to disinherit Trace and Kendall. Those facts present enough evidence to raise a bona fide issue as to the third element of undue influence.

53

*See Morrell*, 2022 WL 959943, at \*13 (stating that "[a] disposition may be unnatural . . . if it excludes a property owner's natural heirs or favors one heir at the expense of others who ordinarily would receive equal shares" and that "[a] property owner's preference for one beneficiary over others may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that call[s] the preference into question or discredits it"); *see also Est. of Luce*, 2018 WL 5993577, at \*12 ("Whether a particular disposition is unnatural is usually for the factfinder to decide based on the circumstances."); *Est. of Johnson*, 340 S.W.3d 769, 784 (Tex. App.—San Antonio 2011, pet. denied) ("[E]vidence of a reasonable explanation for an unnatural disposition does not prevent a jury from finding undue influence.").

Viewing the evidence in the light most favorable to the trial court's temporary injunction order and indulging every reasonable inference in its favor, Trace and Kendall sufficiently demonstrated that they have a probable right to relief on their claim that Lonnie was unduly influenced into changing his will and the Ledbetter Trusts.[38]

We overrule this part of Tawni's second issue.

---

[38]Because we have determined that Trace and Kendall sufficiently demonstrated a probable right to relief on their claim of undue influence, we need not consider their claim that Lonnie lacked the requisite mental and testamentary capacity to sign the complained-of trust and estate documents. *See* Tex. R. App. P. 47.1.

## IV. CONCLUSION

Having overruled Tawni's first issue challenging the trial court's jurisdiction but having sustained parts of her second issue, we reverse paragraphs two through eight of the enjoined activities in their entirety, and we reverse paragraph one of the enjoined activities with respect to all accounts that are not specifically identified. We remand this case to the trial court for proceedings consistent with this opinion.[39]

/s/ Dana Womack

Dana Womack
Justice

Delivered: December 11, 2025

---

[39] *See Cont. Datascan Holdings, Inc.*, 2023 WL 7851509, at *36 n.23 (reversing and remanding to the trial court "to address the deficiencies in the injunction order identified in . . . opinion"); *Cooper Valves, LLC*, 531 S.W.3d at 267 (reversing and remanding only broad and vague sections of temporary injunction).